IN THE COURT OF COMMON PLEAS
WASHINGTON COUNTY, OHIO

| | |
|---|---|
| THOMAS YAKUBIK<br>P.O. Box 41<br>Barlow, OH 45712<br><br>    Plaintiff,<br><br>v.<br><br>E.I. DUPONT DE NEMOURS &<br>COMPANY,<br>1007 North Market Street<br>Wilmington, DE 19898<br><br>    Defendant. | CASE NO.: 12OT296<br><br>JUDGE: LANE<br><br>**COMPLAINT FOR MONEY DAMAGES WITH INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS AND REQUESTS FOR ADMISSION ATTACHED**<br><br>(JURY DEMAND ENDORSED HEREON) |

## COMPLAINT

Now comes the Plaintiff, Thomas Yakubik, by and through counsel, and for his Complaint against the Defendant, states as follows:

### NATURE OF ACTION

1. This is a civil action for compensatory and punitive damages and costs incurred and to be incurred by the Plaintiff for bodily injury arising from the intentional, knowing, reckless, and negligent acts and omissions of the Defendant in connection with the contamination of human drinking water supplies used by the Plaintiff.

### JURISIDICTION AND VENUE

2. At all times material, Plaintiff resided in Washington County, Ohio.

3. DuPont is a Delaware Corporation authorized to conduct business in the State of Ohio

and has a principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

4. This Court has jurisdiction over DuPont by virtue of R.C. 2307.382 because DuPont owns and operates facilities in Ohio, transacts business in Ohio, and contracts to sell its goods in Ohio. Additionally, DuPont's acts and/or omissions, as described herein, have caused tortious injury to Plaintiff in Ohio. Further, DuPont regularly does or solicits business in Ohio, has persistently through its acts and/or omissions caused contamination of human water supply in Ohio, derives substantial revenue from goods used or consumed in Ohio, and has continuous and systematic contacts with Ohio.

5. Venue is proper because DuPont has conducted activity in Washington County that gives rise to this claim for relief.

## GENERAL ALLEGATIONS

6. The Plaintiff realleges and reavers the allegations set forth in paragraph 1 through 5 of his Complaint, as if fully rewritten herein.

7. DuPont owns and operates a manufacturing facility in Wood County, West Virginia known as the "Washington Works Plant", and has been the owner and operator at all times relevant to this Complaint.

8. In connection with its manufacturing operations at its Washington Works Plant, DuPont has used hazardous, toxic and/or carcinogenic wastes, substances, pollutants and/or contaminants, including ammonium perfluorooctanoate (a/k/a C-8/FC-143/APFO/DFS-2/PFOA) (hereinafter "C-8"), (collectively the "Materials") since the early 1950s.

9. During the course of its operations at its Washington Works Plant, DuPont has negligently, recklessly, knowingly, carelessly, wrongfully and/or intentionally allowed, caused, and/or otherwise permitted and is continuing to so allow, cause and otherwise permit releases of

2

Materials from the Washington Works Plant into those waters that are and have been used for human drinking water purposes (the "Releases).

10. C-8 is a bioretentive substance.

11. C-8 is a bioaccumulative substance.

12. C-8 is a biopersistent substance.

13. C-8 is an animal carcinogen.

14. C-8 is a proven hazardous substance.

15. DuPont negligently, recklessly, carelessly, wrongfully, and/or intentionally failed to disclose to those individuals who used water impacted by the Releases that the levels of C-8 detected in the water exceeded DuPont's own internal "community exposure guideline" (CEG) of 1 part per billion (1 ppb) for C-8 in drinking water.

16. By at least May of 2000, DuPont had learned that the manufacturer of the C-8 used by DuPont at its Washington Works Plant, the Minnesota Mining and Manufacturing Company ("3M"), had decided to stop manufacturing and selling C-8, based upon concerns associated with the bio-persistence and relative toxicity of C-8 and threat that the US EPA would ban the material.

17. By at least 2001, DuPont had learned that C-8 had been detected in private water wells hydraulically down-gradient from one or more of the locations where DuPont had dumped C-8 into the ground.

18. Despite knowledge of the same bio-persistence and toxicity concerns known to 3M relating to the use of C-8 and its release into the environment and the fact that C-8 was getting into public and private drinking water supplies, DuPont began direct manufacture of its own C-8 at the Washington Works plant.

3

19. DuPont knew for several years that the level of C-8 discharged from its Washington Works Plant was contributing to the levels of C-8 present in human water supplies.

20. It was not until the Spring of 2001, after the West Virginia Division for Environmental Protection ("WVDEP") first asked DuPont to begin monitoring and reporting to WVDEP the levels of C-8 discharged from DuPont's Washington Works plant into the Ohio River, that DuPont installed a carbon absorption treatment system at its Washington Works plant to attempt to begin reducing the levels of C-8 discharged directly from the Washington Works Plant into the Ohio River.

21. At all times relevant hereto, the Little Hocking Water Association, Inc. ("Little Hocking") has operated a public water supply system that supplies potable water to residences, including the Plaintiff's, in at least eight townships in Washington County, Ohio and two townships in Athens County, Ohio, including approximately 12,000 people.

22. In a March 2009 U.S. EPA safe drinking Safe Drinking Water Act Consent Order with DuPont, the U.S. EPA determined that C-8 and its salts may present an "imminent and substantial endangerment to human health at concentrations at or above 0.40 ppb in drinking water." The levels of C-8 in Little Hocking's aquifer were above 0.40 ppb.

23. The 0.40 ppb level does not account for chronic exposure to C-8. In an effort to account for chronic lifetime exposure, independent scientists at the New Jersey Department of Environmental Protection identified a C-8 drinking water guidance value of 0.04 ppb, an order of magnitude ten times lower than the level set forth in the March 2009 Safe Drinking Water Act consent order.

24. Effective December 1, 2006, the Ohio EPA listed C-8 as a toxic air contaminant.

25. The U.S. EPA has found that C-8 can remain in the human body for years and that

4

drinking water contaminated with C-8 can produce concentrations of C-8 in the blood serum that are higher than the concentrations present in the water itself.

26. Individuals whose residential water is supplied by Little Hocking have some of the highest non-worker C-8 blood levels of any reported in the United States and Canada- ranging from approximately 112 ppb to, at least, 1950 ppb.

27. The average level of C-8 in the blood of people in the United States is 4-5 ppb.

28. Given the high level of C-8 in the blood of Little Hocking's water users along with the bio-persistent nature of C-8 in environmental media and humans, continued C-8 exposure presented a great threat to Little Hocking's water users.

29. Sampling results for Little Hocking's individual production wells have shown levels of C-8 as high as 18.6 ppb. Samples from test wells have shown levels of C-8 as high as 29.1 ppb, samples from test borings have shown levels of C-8 as high as 78 ppb, and soil samples from the wellfields have shown levels of C-8 over 100 ppb.

30. In a 2003 C-8-related West Virginia class action lawsuit ("class action") against DuPont:

    a)      DuPont represented to the court that there is no way for DuPont to prevent its C-8 emissions from getting into the class members' drinking water;

    b)      DuPont represented to the court that there are no alternatives to using C-8 in any of the Washington Works Plant's manufacturing operations; and

    c)      the court found that DuPont continues to actively and intentionally release C-8 from the Washington Works Plant into the air and water.

31. Part of the class action settlement created a Science Panel to conduct research into whether there is a probable link that exists between C-8 and human disease.

32. On April 15, 2012 the Science Panel concluded that there is a probable link between exposure to C-8 and kidney cancer.

5

33. The Science Panel has also found a probable link between exposure to C-8 and testicular cancer, ulcerative colitis, thyroid disease, and pregnancy-induced hypertension to date.

34. Plaintiff received a blood test for C-8 and C-8 was found in his blood.

35. As a result of the C-8 in his blood, Plaintiff had his left kidney removed and Plaintiff was diagnosed with chromophobe renal cell carcinoma ("CRCC").

36. The Releases have made and/or continue to make Plaintiff physically ill and otherwise physically harmed, and/or have caused and continue to cause associated emotional and mental stress, anxiety, and fear of current and future illnesses, including but not limited to, fear of significant risk of cancer and other diseases and illnesses.

## COUNT ONE
## NEGLIGENCE, CONCEALMENT AND FRAUD

37. The Plaintiff realleges and reavers the allegations set forth in paragraph 1 through 36 of his Complaint, as if fully rewritten herein.

38. In connection with its operation of the Washington Works Plant, DuPont has had and continues to have a duty to operate and manage the Washington Works Plant in such a way as to not create a nuisance or condition causing any injury or damage to human health or the environment.

39. DuPont breached its duty of care by negligently operating and managing the Washington Works Plant and conducting other operations and activities at the Washington Works Plant in such a manner as to negligently cause, permit, and allow the Releases.

40. The Defendant's negligent acts and omissions proximately caused and continue to cause damages to Plaintiff in the form of cancer and bodily injury.

41. The Defendant knowingly, intentionally, recklessly and/or negligently failed and/or refused to advise the Plaintiff of the danger to his health and property posed by the Releases.

6

42. At all times relevant herein, DuPont had and continues to have a duty to, *inter alia*:

   a) Take adequate and timely precautions to prevent the Materials from being released and contaminating the environment, including the soil, surface water, sediments, biota, groundwater, and human drinking water;

   b) To remove the Materials from the soil, surface water, sediments, biota, groundwater, and human drinking water;

   c) To adequately warn federal, state, and local authorities, potentially affected members of the public, and purveyors of public water; and

   d) To handle, treat, store and/or dispose of the Materials in such a manner so as to not create a nuisance or a condition causing imminent and substantial danger to human health and/or the environment.

43. Defendant knowingly, intentionally, recklessly and/or negligently withheld information from the Plaintiff, who had a right to know of information which would have prevented Plaintiff from being exposed to the Materials.

44. Plaintiff did not have sufficient information to determine the safety of the drinking water impacted by the Releases and, therefore, relied upon the superior knowledge of the Defendant in deciding to ingest the drinking water, and as result of his reliance on the Defendant's false and misleading affirmative misrepresentations and intentional omissions and hiding of relevant, significant and material facts and information, Plaintiff was misled into believing that the drinking water was safe and effective for human consumption.

45. Defendants withheld information which they had in their possession concerning research, testing, lack of research and testing, studies of humans and animals who had been exposed to the Materials that demonstrated that the Materials cause damage to humans and animals, as well as information that medically, legally, scientifically and ethically the Plaintiff had a right to know before ingesting the drinking water and which Defendants had a duty under Ohio law to disclose.

46. As a proximate result of the aforesaid acts and omissions by the Defendant and acting for and on their own behalf and as agents, ostensible agents, employees, conspirators and joint venturers of others, contaminated drinking water was placed in the stream of commerce, distributed and sold to customers in Ohio and ingested by the Plaintiff, and the Plaintiff was injured as herein alleged.

47. The aforesaid acts and omissions of Defendant, acting in the manner as alleged herein, were negligent and as a proximate result the Plaintiff has suffered and will suffer the following damages:

   a) Expenses reasonably necessary for the monitoring of cancer and other illnesses or diseases associated with the ingestion of the Materials;

   b) Medical and hospital bills for the removal of the Plaintiff's left kidney;

   c) Medical and hospital bills for future treatment, diagnostic and preventative treatment, and treatment of injuries;

   d) Physical injury, both temporary and permanent;

   e) Severe and significant emotional distress and mental pain and suffering;

   f) Humiliation, embarrassment and fear;

   g) Loss of enjoyment of life;

   h) Annoyance and inconvenience; and

   i) Other damages, which, under the law and circumstances, Plaintiff is entitled to recover, including attorneys fees and costs associated with the prosecution of this action.

## COUNT TWO
## NEGLIGENCE PER SE

48. The Plaintiff realleges and reavers the allegations set forth in paragraph 1 through 47 of his Complaint, as if fully rewritten herein.

49. By its acts and omissions resulting in the Releases, the Defendant violated and continues to violate one or more applicable Ohio statutes, including but not limited to R.C. 6111 *et seq.*, constituting negligence per se.

50. The Defendant's violation of law proximately caused and continues to proximately cause damage to Plaintiff in the form of bodily injury for which Defendant is liable.

## COUNT THREE
## ABNORMALLY DANGEROUS OR ULTRAHAZARDOUS ACTIVITY

51. The Plaintiff realleges and reavers the allegations set forth in paragraph 1 through 50 of his Complaint, as if fully rewritten herein.

52. Plaintiff has been exposed to the Releases from the Washington Works Plant as a proximate result of DuPont's acts and omissions.

53. The use, disposal, storage, generation and release of the Materials are abnormally dangerous or ultrahazardous activities in which DuPont is and has been engaged.

54. By reason of carrying on such activities which proximately and foreseeably caused the contamination of Plaintiff's water supply and the surrounding environment, DuPont is strictly liable to Plaintiff even if it exercised the utmost care to prevent harm, which DuPont nonetheless failed to do. This liability arises pursuant to applicable state common law.

55. DuPont directly and proximately caused injury and bodily harm to Plaintiff described herein.

## COUNT FOUR
## PAST AND CONTINUING TRESPASS AND BATTERY

56. The Plaintiff realleges and reavers the allegations set forth in paragraph 1 through 55 of his Complaint, as if fully rewritten herein.

57. The Defendant's acts and omissions resulting in the Releases have resulted and

9

continue to result in the release and threatened release of Materials at, under, onto, and into Plaintiff's body and property.

58. The Materials present in Plaintiff's body originating from the Washington Works Plant were at all relevant times hereto, and continue to be, the property of Defendant.

59. The invasion and presence of the Materials at, under, onto, and into Plaintiff's body and property was and continues to be without permission of authority from Plaintiff.

60. The presence and continuing presence of the Material at, under, onto, and into Plaintiff's body and property constitutes a continuing trespass and battery.

61. The Defendant's past and continuing trespass and battery upon Plaintiff's body and property proximately caused and will continue to proximately cause damage to Plaintiff in the form of bodily injury and property damage, for which the Defendant is liable.

## COUNT FIVE
## PUNITIVE DAMAGES

62. The Plaintiff realleges and reavers the allegations set forth in paragraph 1 through 61 of his Complaint, as if fully rewritten herein.

63. The Defendant's acts and omissions as described above were conducted with such intentional, malicious, wanton, willful, and reckless indifference to Plaintiff's rights and flagrant disregard for the safety and property of the Plaintiff that the Defendant is liable for punitive damages.

WHEREFORE, the Plaintiff demands judgment against the Defendant as follows:

1. On Count One of the Plaintiff's Complaint, compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000.00);

2. On Count Two of the Plaintiff's Complaint, compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000.00);

3. On Count Three of the Plaintiff's Complaint, compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000.00);

4. On Count Four of the Plaintiff's Complaint, compensatory damages in an amount in excess of twenty-five thousand dollars ($25,000.00);

5. On Count Five of the Plaintiff's Complaint, compensatory and punitive damages in an amount in excess of twenty-five thousand dollars ($25,000.00); and,

6. On all counts of the Complaint, interest, costs, attorneys fees and any further relief that this Court deems the Plaintiff entitled.

Respectfully submitted,

DAVIS & YOUNG

By: /s/ 
GREGORY H. COLLINS (0040230)
DAVID G. UTLEY (#0038967)
One Cascade Plaza, Ste. 800
Akron, Ohio 44308
Phone:       (330) 376-1717
Facsimile:   (330) 376-1797
E-mail:      gcollins@davisyoung.com
             dutley@davisyoung.com

*Attorneys for Plaintiff, Thomas Yakubik*

11

## JURY DEMAND

Pursuant to Ohio Rule of Civil Procedure 38(B), Defendant hereby demands a trial by jury on all issues herein.

Respectfully submitted,

DAVIS & YOUNG

By: /s/ Gregory H. Collins
GREGORY H. COLLINS (0040230)
DAVID G. UTLEY (#0038967)
One Cascade Plaza, Ste. 800
Akron, Ohio 44308
Phone: (330) 376-1717
Facsimile: (330) 376-1797
E-mail: gcollins@davisyoung.com
dutley@davisyoung.com

*Attorneys for Plaintiff, Thomas Yakubik*

12